IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

PENNSYLVANIA GENERAL INSURANCE COMPANY, a/s/o John Sirois, and SAFEGUARD INSURANCE COMPANY a/s/o Rui Henriques

Plaintiffs,

vs.

CHURCHILL & BANKS, LTD. and COTTAGE PLAZA, LLC

Defendants/Third-Party Plaintiffs.

vs.

J. H. LYNCH & SONS, INC.

Third-Party Defendant.

CIVIL ACTION
NO.: 04-48 T

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXTEND DISCOVERY**

Now come the Plaintiffs who hereby oppose the Defendant's Motion to Extend Discovery. Plaintiffs rely on the Memorandum of Law in Support of Plaintiff's Opposition to Defendants' Motion to Extend Discovery filed together herewith, and the exhibits thereto.

Plaintiffs,

PENNSYLVANIA GENERAL INSURANCE COMPANY and SAFEGUARD INSURANCE COMPANY

By their attorneys,

Marco Griati (#5561)
Roberts, Carroll, Felstein & Peirce
10 Weybosset Street, 8th Floor
Providence, RI 02903
401-521-7000 phone
401-521-1328 fax

Matthew F. Noone

Matthew F. Noone
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103
215-665-2192 phone
215-701-2192 fax

CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of July, 2005, that a true and correct copy of Plaintiffs' Opposition to Defendants' Request for An Extension in the Discovery Deadline, has been duly furnished via first class mail to the following counsel of record:

Faith A. LaSalle, Esq.
Law Offices
One Turks Head Place,
Suite 1010
76 Westminster Street
Providence, RI 02903

Robert J. Quigley, Jr., Esq.
McKenney, Jeffrey & Quigley
95 Chestnut Street, 6th Floor
Providence, RI 02908

MARCO P. URIATI

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

PENNSYLVANIA GENERAL INSURANCE COMPANY, a/s/o John Sirois, and SAFEGUARD INSURANCE COMPANY a/s/o Rui Henriques

Plaintiffs,

vs.

CHURCHILL & BANKS, LTD. and COTTAGE PLAZA, LLC

Defendants/Third-Party Plaintiffs.

vs.

J. H. LYNCH & SONS, INC.

Third-Party Defendant.

CIVIL ACTION
NO.: 04-48 T

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO EXTEND DISCOVERY**

1. The original complaint was filed on February 17, 2004, and served upon the defendants on February 18, 2004.

2. On July 21, 2004, this Court held a pretrial conference where it established the following initial scheduling order: Discovery cutoff – May 1, 2005; Deadline for filing all motions – May 1, 2005, and pretrial memorandum deadline of July 1, 2005.

3. On November 4, 2005, this Court held a teleconference where the defendants expressed a desire to join JH Lynch & Sons, Inc. as a third-party defendant. As a result of this proposed joinder, the Court extended all deadlines by two months.

4. As a result of the Court's first extension of the original scheduling order, the amended discovery deadline was changed to July 1, 2005.

5. On June 30, 2005, the day before the expiration of the amended discovery deadline, the defendants filed the instant motion seeking a second extension in the discovery deadline. Specifically, the defendants request a 45 day extension in the discovery deadline. It should be noted that while the defendants ask for a "thirty day" extension in their motion, they also specifically ask that the deadline be changed to August 15, 2005, which is in fact a 45 day extension in the current July 1, 2005 discovery deadline.

6. The only reason that the defendants assert for extending the discovery deadline is the need to depose one witness, Joseph Tavares. The defendants claim that Mr. Tavares is a crucial witness. However, the defendants do not offer any facts to substantiate this claim.

7. Mr. Tavares was subpoenaed by plaintiffs to appear for deposition. He was scheduled to be deposed on January 13th along with several other witnesses. Mr. Tavares appeared for his deposition, however, due to the length of time taken with the other witnesses, Mr. Tavares was not deposed and was released by the plaintiffs.

8. Although Mr. Tavares has not been deposed, his employer, Mr. Dennis Maroney, was deposed. Mr. Maroney testified that the afternoon of the fire was the only day that Mr. Tavares ever worked for him. Maroney Dep. at 14-21 attached as Exhibit 1. He testified that they were working in a building in front of the southwest portion of the sawtooth building, nowhere near where the fire started. He did not observe the fire until one of the tree-cutter employees told him that the building was on fire. He said he "told Joe let's hustle and get the truck loaded." *Id.* at 21. He said that when he left the site, the firemen were already on site fighting the fire.

9. Attached as Exhibit 2 is a statement that Mr. Tavares gave to the police after the fire. His statement comports exactly with how his employer, Mr. Maroney testified. In other

words, he did not see the fire in its incipient stages, he was not working in the area where the fire originated, and he did not work at the job site any other days previous to the fire. There is nothing of any significance that this witness can testify about that will impact the outcome of the case one way or the other. So there is simply no basis for extending the discovery deadline so that his deposition may be taken.

10. Although the defendants identify Mr. Tavares as the only person needing to be deposed, the defendants do not limit their request for an extension of the discovery deadline to deposing him only. Instead, they seek a broad extension that will enable them to depose any additional witnesses they choose. In this case, twenty-one fact witness depositions have taken place, as well as four expert depositions. All the parties have certainly had a full and fair opportunity to obtain the discovery they need to develop their cases. There is no reason why any further fact depositions are necessary.

11. The defendants assertion that the requested second extension will not "interfere with the progress of this case" is simply not true. Additional depositions may result in the revelation of additional facts that may require one or more experts to file supplemental reports. These supplemental reports may require further depositions of the expert witnesses.

12. The discovery deadline was already changed once in this case to accommodate the defendants' desire to join JH Lynch as an additional defendant. The apparent reason for the joinder was that JH Lynch had contracted with the defendants for the erection of a temporary construction fence around the perimeter of the property, something that JH Lynch eventually hired a subcontractor to perform. Yet, none of the defense experts offer any opinions that would suggest that JH Lynch was negligent or otherwise failed in their duty to arrange for the erection of the temporary construction fence—So query why JH Lynch is still a party to this litigation?

WHEREFORE, the plaintiffs respectfully request that the defendants' motion for a second extension in the discovery deadline be ***DENIED.***

PENNSYLVANIA GENERAL INSURANCE COMPANY and SAFEGUARD INSURANCE COMPANY, Plaintiffs
by their attorneys,

Marco Uniati (#5561)
Roberts, Carroll, Felstein & Peirce
10 Weybosset Street, 8th Floor
Providence, RI 02903
401-521-7000 phone
401-521-1328 fax

Matthew F. Noone
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103
215-665-2192 phone
215-701-2192 fax

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of July, 2005, that a true and correct copy of Plaintiffs' Opposition to Defendants' Request for An Extension in the Discovery Deadline, has been duly furnished via first class mail to the following counsel of record:

Faith A. LaSalle, Esq.
Law Offices
One Turks Head Place,
Suite 1010
76 Westminster Street
Providence, RI 02903

Robert J. Quigley, Jr., Esq.
McKenney, Jeffrey & Quigley
95 Chestnut Street, 6th Floor
Providence, RI 02908

MARCO URIATI

Page 13

Q: I'm going to show you a document which is the corner of Cottage and the highway.
A: This is the mill that burnt?
Q: Exactly.
MR. MARONEY: Wait until the question is asked.
Q: This document that I've had marked as P-20 is a footprint of the diagram or layout of the mill, showing a substantial portion of the mill. It is, however, missing this area, this triangular area here — P-20 does not, you will note, does not include this triangular area which I believe is referred to as the parking area in front of the facility or the site.
A: Okay.
Q: But referring to P-20, if you could, using my pen, could you please mark the area where you were removing the decking from the building. Can you show me the building and mark the area that you were working in on day one.
MR. MARONEY: Wait until he asks the question.
Q: That's the location on day one, to the best of your recollection?
A: If I had to do this, I would make this — I would

Page 14

draw a line here, and that's the front of that building, and then the saw tooth is here.
Q: Okay.
A: I never entered the saw tooth. I mean, I walked through it one day, but that's not where my business was. My business was here.
Q: And the building that you marked with that X, is that the only building you were working from, and the only building you had planned to work from during this project?
A: Yes.
Q: Day two, again, this may sound repetitive, but again, the building that you've marked with the X there, that's the only building you were working from?
A: That's the only building that I worked in.
Q: On how about on the day of the fire, is that the only building that you worked in?
A: Right in that corner.
Q: That's it?
A: I was loading a trailer.
Q: How about Mr. Tavares, what was he doing during those days?
A: That was the only time that he worked with me was the afternoon of that fire.

Page 15

Q: The day of the fire?
A: The day of the fire. He worked a few hours with me. That's it.
Q: So prior to that time then, you were the only one —
A: I worked by myself.
Q: Let me finish my question. Prior to Mr. Tavares working on the day of the fire, you were the only one that was salvaging lumber from this building that you marked with an X?
A: Right.
Q: Nobody else?
A: Nobody else.
Q: Okay. During the two to three days that you were working at the Greenhalgh Mill, did you ever observe anyone else walking in and out of this building that you marked with an X?
A: Two gentlemen approached me when I was in the building.
Q: What day was that?
A: I couldn't tell you.
Q: Prior to the fire obviously, right?
A: Yes.
Q: Do you remember who they were?
A: I believe they were lumber buyers.

Page 16

Q: Okay. Do you know their names?
A: Taylor Moore and Peter Corr.
Q: How do you know these gentlemen?
A: They are in the reclaimed lumber business, biggest in the country.
Q: So you have done business with these guys in the past?
A: No.
Q: This had been the first time?
A: I wasn't doing business with them.
Q: Was there a discussion with them about doing business or were they there on a separate, for a different reason?
MR. MARONEY: Objection.
A: They were there for a different reason.
MS. LaSALLE: What day was this?
MR. BUCHANAN: I asked him in any of the days leading up to the fire. I believe he didn't have a specific recollection as to which day these men approached him.
Q: Now, did you have any dealings with Mr. Baccaire or his crew while you were working at the site at any time?
A: I'd say hi to him or hello, you know, I'm going to do this, and that was it.

Page 17

Q: Did they direct you in any way with regard to the work you were doing?
A: No.
Q: So basically you were on your own?
A: On my own.
Q: During the course of your work there, did you ever have conversations at the site with anyone from Churchill & Banks?
A: Not at all.
Q: How about with J. H. Lynch?
A: Not at all.
Q: When you started to work at the job site or at the Greenhalgh Mill, were you ever provided with a security handbook from anyone?
A: Security?
Q: M-hm.
A: No.
Q: Had anyone ever had discussions or conversations with you about trespassers, that is, either children or homeless people entering and leaving the property?
A: I don't recall.
Q: When you were working in that building marked with the X, did you ever notice any signs that homeless people were living in that particular section of

Page 18

the building?
A: There was debris all about the building.
Q: In the building marked with the X?
A: In the building marked with the X, yes, debris.
MS. LaSALLE: In the building marked with the X; is that your testimony?
THE WITNESS: Yes.
Q: Can you give me some examples of the debris that you observed in that building.
A: Cans, the basement was loaded with electric motors, cables, carts.
Q: What kind of carts?
A: Just a couple of old carts.
Q: Shopping carts?
A: No, pushcarts that you normally use in a textile mill.
Q: Okay. Any evidence of cardboard boxes or rags or blankets that homeless people would have utilized to sleep with, that you can recall?
A: I don't recall, no.
Q: Was there any graffiti inside that building?
A: I don't recall that.
Q: Was there any graffiti on the outside of that building?
A: I don't recall that either.

Page 19

Q: Do you recall at any time when you were at the property whether or not there were any security guards at the site?
A: I don't recall seeing any.
Q: Any night watchman, do you recall, do you recall seeing any night watchman?
A: No, I don't.
Q: Do you smoke?
A: No.
Q: Does Mr. Tavares smoke?
A: He didn't then.
Q: Is it fair to say that neither you nor Mr. Tavares smoked at the Greenhalgh Mill during the work you were performing there?
MS. LaSALLE: Objection.
Q: You can answer if you can.
A: Neither one of us smoked. I told him no smoking.
Q: At any time that you were working at the site, did you ever observe any fires?
A: No.
Q: In any of the buildings at all?
A: Excuse me, the day of the mill, I did observe.
Q: The day of the —
A: The mill fire, I saw the fire.
Q: Prior to your observations of the fire in

Page 20

connection with the incident in question, had you ever seen any fires —
A: No.
Q: — on the property?
A: No.
Q: On the date of the fire, what time did you arrive at the property?
A: Approximately one-thirty in the afternoon.
Q: And what did you do when you got there?
A: I notified John Baccaire that I was there and that I'd be working in that portion of the mill and that's where I'd be working.
Q: And was Mr. Tavares with you at that point?
A: Yes, he was.
Q: Did you go there together?
A: Yes.
Q: And when did your first observe — Strike that. At some point after you arrived that day, did you observe smoke and/or fire originating from any sections of the buildings on the site?
A: I was inside the basement of the mill. There's a loading dock there. I had the trailer in there and I was loading, and I believe there was a guy from the logging company and said, "Hey, you got to get out of here; the mill is on fire," so I —

Page 21

Q: Did you want to finish?
A: I walked out and I saw there was some smoke coming from about here.
Q: Now, referring to Exhibit P-20 and using the blue pen in front of you, could you depict in that diagram where you were located when you were advised that there was a fire on the premises.
A: Right there (indicating).
Q: Can you take the pen and — draw a circle next to that X. Okay. Now, where was Mr. Tavares at that time?
A: Right beside me.
Q: Can you draw another circle?
A: Yes.
Q: So you were basically standing right next to each other. After you were informed of the fire, what did you do next?
A: I told Joe let's hustle and get the truck loaded.
Q: Did you continue to work?
A: Yes.
Q: How long did you continue to work before you decided —
A: Until the truck was loaded.
Q: Can you show me drawing a square where the loading dock is on that diagram, P-20.

Page 22

A: Loading dock is there and then down in the basement.
Q: Is that an outside and inside loading dock? Is part of it enclosed?
A: No, I had to back up to it.
Q: It's all on the outside then?
A: Yes.
Q: Overhead door that services it?
A: There was one.
Q: I'm not clear about exactly where you and Mr. Tavares were. Were you inside or outside the building at the time — strike that — at the time you were advised of the fire?
A: I was inside the building and he was right beside me. We were in the basement of the building. The loading dock was on a different level. I went down and backed up again into the basement, put the trailer in the basement, and I was loading. That's when I was informed.
Q: So after you finished loading the truck, what did you do?
A: I got in the truck with Joe Tavares, proceeded out. I asked the firemen if I could cross their water lines. They had their lines run out and they told me yes, I could. I drove up into this

Page 23

area here, to the parking area, and I strapped the load down, and then I left.
Q: So when you were leaving the Greenhalgh Mill site, the fire department was already engaging in suppression activities?
A: Correct. The fire station is right there.
Q: Now, when, if at any time subsequent to being notified of the fire, did you first observe smoke and flames coming out of the building?
A: When I was told by the logger, one of the logging guys that the mill was on fire, that's when I came out. At that time, I also observed the fire department doing there, going, you know, going to it. There were two firemen going in that area.
Q: So the notification and your observations of the fire and the fire department coming to the scene all sort of happened like one, two, three?
A: Just happened quickly.
Q: And can you, using that pen on the diagram, in the diagram on P-20, can you indicate where you were when you first observed smoke and fire coming from the building?
A: Want me to use a triangle?
Q: That's fine. That would be great.
A: I walked out to here.

Page 24

Q: Okay. Where was Mr. Tavares?
A: I believe he was still in the building. He might have came out. I don't recall.
Q: And then after you observed the smoke and flames, did you — I guess what I'm trying to get at — did you go out to see whether or not the fire was really — there was really a fire and then you went back into work, confirming what you were being told about a fire?
A: When I saw the fire department coming in and I saw the smoke coming in — I had figured that it was on fire.
Q: So everything basically, like you said, it sort of happened spontaneously?
A: Correct.
Q: Now, when you first observed fire and smoke, referring to that diagram, can you indicate with the blue pen where you can recall smoke and fire emanating from?
A: First I didn't see fire. I saw smoke. I didn't see fire until after. I believe it was somewhere in here. Coming from here. It was just a small gray smoke coming out.
Q: Now, was the smoke emanating from within the building or outside of the building?

# WITNESS STATEMENT

CR# 03-8206-OF

Time: 1045 AM
Date: 11-17-03
Place: PARKING LOT OF MILL FIRE

I. JOSEPH L. TAVARES ,voluntarily,
without threats or promises, make the following statements:

Q. What is your name ?
A. JOSEPH L TAVARES

Q. What is your date of birth?
A 3-1-49

Q. What is your present address?
A. [redacted]

Q. What is your occupation?
A. CONSTRUCTION

ON FRIDAY, 11-14-03, I WORKED WITH DENNIS MOROWET AND WE ARRIVED AT THE MILL IN PAWTUCKET AT ABOUT 12:30 OR 1:00PM. WE ARRIVED IN DENNIS' TRUCK WITH HIS TRAILER.

DENNIS SHOWED ME WHAT HE WANTED DONE WHICH WAS LOADING THE CARTS WITH CUT FLOORING AND THEN LOADING THEM ONTO THE TRAILER, WHICH HE HAD BACKED UP TO THE DOOR.

WE WERE LOADING THE TRUCK WHEN SOMEONE YELLED IN TO US TO TELL US TO GET OUT BECAUSE THE BUILDING WAS ON FIRE. WE FINISHED LOADING THE TRAILER AND THEN DENNIS DROVE OUT TO THE PARKING LOT WHERE HE SECURED THE TRAILER AND WE LEFT.

WHEN WE WERE PULLING OUT, THE FIRE TRUCKS WERE ALREADY ON THE SCENE AND WERE PUTTING WATER ON THE FIRE.

Statement taken by [signature]
Witnesses: [signature]

Joseph L. Tavares
Signature